

**ORDERED in the Southern District of Florida on May 30, 2018.**

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re: | CASE NO. 11-15802-RAM |
| | CHAPTER  7 |
| SHEELA KUMAR, | |
| | |
| Debtor. | |

**ORDER AWARDING FEES AND EXPENSES**
**AND DETERMINING ALLOCATION TO WEED PROPERTY**

The Court conducted a hearing on January 10, 2018, on the following fee applications (the "Fee Applications"):

> A.  Summary of First and Final Application for Compensation of KapilaMukamal, LLP (the "KapilaMukamal Application") [DE# 449];

> B.  Summary of Final Application of Counsel for Trustee (the "Meyer Application") [DE# 450]; and

C.     Summary of First and Final Fee Application of DLA
       Piper LLP (US) for Allowance of Compensation for
       Services Rendered and Reimbursement of Expenses
       Incurred as Special Counsel to Chapter 7 Trustee
       (the "DLA Piper Application")[DE# 451]; and

D.     Summary of Final Fee Application of Marcum, LLP,
       Accountant for Chapter 7 Trustee (the "Marcum
       Application") [DE# 231].

In addition to determining the total fees and costs to award
to the applicants, the Court must determine what portion of each
fee and cost award is attributable to the estate's administration
of the property located at 2401 Dwinell Way, Weed, California (the
"Weed Property").  This allocation is necessary to calculate the
distribution that Zafir Anjum will receive using the methodology
described in detail in the Court's October 13, 2017 Order Granting
in Part and Reserving Ruling in Part on Weed Property Cost Motion,
Setting Deadlines for Fee Applications, and Setting Hearing on Fee
Applications (the "Oct. 13, 2017 Order") [DE# 443].

The Court has reviewed the Fee Applications, the Objections
filed to each application by Anjum [DE#s 244, 453, 454 and 455],
the Objection to DLA Piper's Application filed by the United States
Trustee [DE# 464], the Trustee's Objection to Fee Application By
DLA Piper LLP [DE# 457], the Omnibus Response to Zafir Anjum's and
the United States Trustee's Objections to First and Final Fee
Application of DLA Piper (US) as Special Counsel to Chapter 7
Trustee (the "Omnibus Response") [DE# 465], and the Notice of

2

Filing Regarding the United States Trustee's Objection to First Interim Application for Compensation for DLA Piper as Special Counsel for the Trustee (the "UST's Recommended DLA Piper Fee") [DE# 473]. The Court has also considered the Notice of Filing - Allocation of Fees Relating to KapilaMukamal, LLP's First and Final Fee Application (the "KapilaMukamal Proposed Allocation") [DE# 471], and the Notice of Filing - Allocation of Fees Related to Marcum Final Fee Application [DE# 472]. Finally, the Court has considered the lengthy record in this case, considered the arguments and testimony presented at the January 10th hearing, and considered applicable law, including the factors listed in 11 U.S.C. § 330(a)(3) for determining the amount of reasonable compensation to award to a professional.

## General Background

The Debtor, Sheela Kumar, filed this chapter 7 case as a no asset case on March 4, 2011. The largest creditor in the case is the Debtor's ex-husband, Anjum, who has an allowed $1,237,592 unsecured claim and a $198,000 secured claim arising from a long, hotly contested divorce case in California.

Before the divorce, the Debtor and Anjum owned property together in a remote section of Northern California. The property has been commonly referred to in this case as the Weed Property. Before filing her chapter 7 petition, the Debtor fraudulently

transferred the Weed Property to a corporation she created.  Anjum was able to set aside the fraudulent transfer in the California court administering the divorce case.  Title to the Weed Property was problematic because, among other things, the property was purportedly restored to community property, but the parties' marriage had already been dissolved.  These title issues made the Trustee's efforts to sell the Weed Property more difficult.

Once the fraudulent conveyance was set aside and certain legal challenges by Anjum were resolved, the Trustee became the owner of a one-half interest in the Weed Property with Anjum owning the other half.  The Trustee then sought to sell the Weed Property to realize value for his ½ interst.

Marketing the Weed Property and pursuing a sale proved to be a lengthy and complicated process.  Some of the major issues included the following:

A.    The Weed Property came into the estate with a 9,000 square foot house in disrepair located on 75 acres of land in an extremely remote location in California;

B.    Based on Anjum's purchase of the Weed Property for $1,300,000 in September 2002, the Trustee reasonably believed that the property could be sold at or above that price;

C.    Unfortunately, given the size of the property and its remote location, there was no identifiable comparable property.

4

Therefore, the Trustee had to have an experienced person assisting him in analyzing the market value and determining how best to market and sell this significant estate asset;

D.   Because the property was in California and there were anticipated legal issues in closing a sale, the Trustee also needed special counsel to assist in negotiating sale contracts and pursuing closings.

E.   The sale process included the use of three real estate brokers and one auction company;

F.   After no success in obtaining bona fide offers through a second national broker, the Trustee pursued an auction through a national auction company with the assistance of a third local broker;

G.   The auction efforts were also unsuccessful, and eventually the Trustee obtained a purchase offer of only $450,000.

As discussed later in this Order, a significant portion of the time spent by the professionals in this case was devoted to maintaining, marketing and attempting to close on several successive offers to purchase the Weed Property.

Despite the disappointing results of the sale efforts on the Weed Property, this case will result in a distribution in excess of 80% to the creditors, largely because of the Trustee's ultimate

success in collecting almost $1.4 million on foreign judgments long thought to be uncollectible.

As described earlier, Anjum is the largest creditor in the case with about 86% of the total allowed unsecured claims. Therefore, Anjum has the most to gain by a reduction in the amounts awarded to professionals. However, Anjum's actions in the case greatly increased the Trustee's professional fees. Anjum opposed almost everything the Trustee attempted to do in this case, including, most significantly, opposing the Trustee's efforts to sell the Weed Property.

The Court will now address each of the fee applications.

### The Marcum Application

Marcum was retained on January 10, 2012, to perform accounting services for the Trustee and to provide advisory and consulting services to the Trustee to assist in the marketing and sale of the Weed Property. Marcum seeks $68,363.50 in fees and $136.54 in expenses.

A significant portion of the Marcum services were performed by Frank Kessler, who testified at the January 10th hearing. Kessler has considerable experience in real estate and property management. He was active in the sale and marketing effort and assisted the Trustee by managing the Weed Property, obtaining required insurance and providing for maintenance. Mr. Kessler was

6

also actively involved in the difficult sale and marketing strategies, dealing with brokers, auctioneers and prospective purchasers.

As described in the general background provided earlier, marketing the Weed Property was a long and complicated endeavor, involving multiple brokers and an auction company. Mr. Kessler assisted the Trustee by vetting the brokers, preparing recommendations for their engagement, and receiving purchase offers.

Throughout the marketing process, Mr. Kessler was in contact with brokers and potential purchasers. He also coordinated the preparation and execution of purchase contracts, vetted the credit worthiness of interested purchasers, and coordinated the necessary interactions between counsel, brokers and title companies.

By necessity, the Trustee had to maintain and insure the Weed Property through this entire process. Mr. Kessler played the lead role in accomplishing these tasks, keeping necessary insurance coverage in place and arranging for necessary repairs at the most reasonable prices available.

In his objection [DE# 244], Anjum argues that Mr. Kessler was performing Trustee duties. The Court disagrees. Based upon the numerous difficulties in maintaining and marketing the Weed Property, it was prudent for the Trustee to retain Marcum not only

for accounting and tax services, but also for advisory and consulting services.  It is wholly unreasonable to expect that the Trustee, without significant skilled help, could have undertaken the sales, marketing and maintenance issues himself.  Moreover, it is likely that it would have been more costly for the Trustee to rely on an on-site property manager to coordinate maintenance and repair, or to rely solely on attorneys to coordinate the sale and marketing effort.

Notwithstanding the foregoing, the Court finds cause to reduce the total fees sought by Marcum.  Among other things, there were time entries lacking sufficient detail, time billed for case administration tasks such as updating pleadings that the Court finds are not compensable, and time spent in connection with collection of a judgment against Continental Trust that the Court finds was not within the scope of Marcum's retention.  Overall, after review of the billing detail, the Court finds it appropriate to reduce the fee award by $5,000.

In sum, the Court finds that Marcum is entitled to fees in the amount of $63,363.50 and expenses of $136.54.  Of this amount, the Court finds that $46,000 is allocable to the Weed Property.

### The KapilaMukamal Application

KapilaMukamal was retained on June 11, 2014, *nunc pro tunc* to May 1, 2014.  This retention was essentially a continuation of the

services previously performed by Marcum, necessitated because Mr. Mukamal left Marcum and joined with Soneet Kapila on May 1, 2014, to form KapilaMukamal.  KapilaMukamal requests fees of $44,201.20. Mr. Kessler left Marcum and joined KapilaMukamal and his time entries totaling $39,554 represents a majority of the time detailed in the application.  The remainder of the time is for tax work.

The Court finds that the continued services performed by Mr. Kessler and other KapilaMukamal professionals were necessary and beneficial to the estate for the reasons discussed above in evaluating the Marcum Application.  Anjum's objection [DE# 454] argues that Mr. Kessler is not an accountant and that the services he performed fell within the statutory duties of the Trustee.  The objection is overruled.  As discussed earlier, maintaining, insuring and attempting to sell the Weed Property presented unusual challenges and the Court is satisfied that Mr. Kessler's services were necessary and beneficial to the estate.  His total hourly billings for the Marcum and KapilaMukamal Applications of about $81,000 seem high at first blush.  However, Mr. Kessler worked on this engagement for over five years, so his billings average out to about $15,000 or $16,000 per year.  The Court finds that this sum is reasonable given the necessity of his services and the skill and experience he brought to the tasks.

9

In sum, the Court finds that KapilaMukamal is entitled to fees in the amount of $44,201.20. Of this amount, the Court finds that $39,238 is allocable to the Weed Property.

### The Meyer Application

Robert C. Meyer, P.A. ("Meyer") was retained as counsel to the Trustee on May 3, 2011. Meyer seeks fees in the amount of $318,395.57 and costs of $8,016.44 for the entire case. On July 22, 2013, Mr. Meyer was awarded interim fees of $100,000 and interim costs of $6,056.05 (the "Meyer Interim Fee Award") [DE# 213] following a hearing on his First Interim Application that sought $149,557 in fees and $6,056.06 in costs. As summarized on p. 9 of the Meyer Application, the application seeks net additional fees of $218,395.57 and net additional costs of $1,960.

Unlike the other professionals whose applications are addressed in this Order, Mr. Meyer's legal services included a broad array of issues not related to the Weed Property. Early in the case, he recovered over $70,000 from attorneys holding prepetition retainers. Thereafter, he focused on a suspicious mortgage satisfaction executed by the Debtor on property owned by the Debtor in Doral, Florida. Mr. Meyer successfully prosecuted litigation to avoid the satisfaction of mortgage and then assisted the Trustee in selling the property for $315,100.

Mr. Meyer also prosecuted two adversary proceedings to recover fraudulent transfers obtaining a judgment against the Cool Breeze Trust for $1.5 million [Adv. No. 12-2248] and against the Continental Trust for nearly $6.4 million [Adv. No. 12-1047]. Eventually, $1,375,000 was recovered in satisfaction of these judgments. In a separate adversary proceeding, Mr. Meyer successfully objected to the Debtor's discharge and the denial of her discharge will enable creditors to pursue collection of the remaining portion of their claims after this bankruptcy is closed.

Mr. Meyer was also responsible for resolving Anjum's claims against the estate and defeating Anjum's attempts to prevent a sale of the Weed Property. In particular, Mr. Meyer filed a complaint against Anjum in Adv. No. 15-1434 in June 2015, seeking a judgment entitling the Trustee to conduct a § 363(h) sale of the Weed Property co-owned by Anjum (the "§ 363(h) Adversary"). The complaint was aggressively contested by Anjum, but the Trustee prevailed obtaining a Final Judgment in December 2015 [Adv. No. 15-1434, DE# 57]. The Final Judgment cleared the way for the Trustee to liquidate the estate's interest in the Weed Property by authorizing the Trustee to sell the Weed Property under § 363(h) without Anjum's consent. The Meyer Application details $29,168.35 in fees to prosecute the § 363(h) Adversary.

11

Mr. Meyer also spent significant and necessary time prosecuting an objection to Anjum's claim that he filed on November 10, 2014 [DE# 258]. Anjum argued that the value of his half interest in the Weed Property was not an offset against the judgment he was awarded in his California divorce case with the Debtor. After lengthy briefing on multiple summary judgment motions, the Court entered its March 6, 2015 Order on Objections to Anjum Claim and Related Summary Judgment Motions (the "Claims Order") [DE# 297]. The Claims Order fixed the amount of Anjum's secured and unsecured claims, and rejected Anjum's argument that a portion of his claim should be treated as a priority claim. The Claims Order also ruled in favor of the Trustee and against Anjum on the setoff issue, finding that the funds Anjum receives attributable to his half interest in the Weed Property, must be applied to reduce his allowed unsecured claim [DE# 297, p. 44]. Anjum appealed the Claims Order. Mr. Meyer incurred over $30,000 in additional fees to successfully defend the appeal. These fees were also necessary and benefited the estate.

Finally, Mr. Meyer was responsible for filing all of the motions in this case relating to the Weed Property, including motions to approve expenses incurred in maintaining the Weed Property, motions to retain brokers and an auctioneer, and motions to approve sale procedures and purchase offers.

12

Ultimately, the estate will only realize $225,000 in value from its half interest in the Weed Property through a credit against Anjum's distribution, plus additional value in the form of credits based on the Trustee's expenses in administering the Weed Property. Nevertheless, the Court finds all of the services Mr. Meyer performed in connection with the Weed Property were necessary and reasonable in pursuit of the Trustee's appropriate goal of recovering value for the estate's interest in the Weed Property.

The Court is overruling Anjum's objection to the Meyer Application [DE# 453]. The argument that Mr. Meyer performed non-legal tasks has no merit. Mr. Meyer performed legal work. Anjum's argument that the § 363(h) adversary provided no benefit also lacks merit. This adversary proceeding was absolutely necessary because Anjum would not consent to a sale of the Weed Property.

The Court finds that Mr. Meyer has worked diligently and efficiently, at a very reasonable hourly rate, in moving this case forward and in addressing and litigating the numerous obstacles to liquidation of the Weed Property presented by Anjum. The application is supported by the Trustee and by the U.S. Trustee.

In sum, the Court finds that Meyer is entitled to fees in the amount of $318,395.57, inclusive of the time in his interim application, and costs of $8,016.44, inclusive of the costs sought in his firm's interim application. Mr. Meyer received $100,000 in

13

fees and $6,056.05 in costs pursuant to the Meyer Interim Fee Award.  Therefore, the net award to Mr. Meyer is $218,395.57 in fees and $1,960 in costs, for a total award of $220,355.57.

The Court cannot determine the proper allocation of Mr. Meyer's services to the administration of the Weed Property. Certainly, the $29,168.35 in fees to prosecute the § 363(h) Adversary are allocable to the administration of the Weed Property. Without a judgment in his favor in the § 363(h) Adversary, the Trustee would have been unable to sell the Weed Property without Anjum's consent.

By contrast, the fees incurred in resolving the amount of Anjum's claim, including the fees incurred in defending Anjum's appeal, are not fees allocable to administration of the Weed Property.  Certainly, it was important to resolve the amount of Anjum's claim and the contested setoff issue, and the fees incurred in this effort were reasonable, necessary, and compensable in the administration of the bankruptcy case.  However, the time spent resolving Anjum's claim was not an expense attributable to the administration of the Weed Property.

Clearly Mr. Meyer spent significant time in the main case in drafting and arguing numerous motions directly related to the maintenance of the Weed Property, and the Trustee's efforts to market and sell the Weed Property.  Unfortunately, it is difficult

14

to quantify these services without a line by line review of the Meyer Application, because the Application does not have a separate activity code for matters directly related to the Weed Property. For present purposes, the Court is estimating low and allocating $50,000 of time incurred in the main case to the administration of the Weed Property. Adding this amount to the $29,168.35 incurred in the § 363(h) adversary results in a total of $79,163.35 in Mr. Meyer's fee award allocable to the administration of the Weed Property. The Court will consider a supplemental submission by Mr. Meyer to better quantify the services related to the Weed Property if it becomes important in resolving the Anjum distribution amounts.

### The DLA Piper Application

DLA Piper was retained as special counsel to the Trustee on February 11, 2013. As set forth in the retention order [DE# 195], the Court authorized the Trustee:

> to employ Craig V. Rasile and James Hurley of the law firm of DLA as special counsel for the Trustee to negotiate, review and revise, as necessary, the Purchase and Sale Agreement, to review the sale order, to resolve title policy issues and to act as closing counsel for the sale of that certain real property described as 2401 Dwinell Road, Weed, California 9609, Assessor's Parcel No. 020-071-190 situated in Weed, County of Siskiyou, California which is co-owned as tenants in common by the Debtor and Zafir Amjun.

As described in the Application to retain the firm [DE# 188], at the time of the retention, the Trustee was seeking to finalize the negotiations and close on a proposed sale of the Weed Property to David Ditmar and D.S. Capital Consulting, LLC.

DLA Piper seeks fees in the amount of $644,062.50 and costs of $2,293.79. At the January 10th hearing, the Trustee acknowledged that DLA Piper performed the services that he requested, but he did express concern about the amount of time billed for the various activities, and concern about the high hourly rates. The Trustee's objection to the hourly rates is overruled. DLA Piper provided a modest discount of the firm's normal billing rates. More importantly, the hourly rates were known to the Trustee at the time of the retention. When a client retains a large, highly regarded national or intentional law firm, the client is subject to the high hourly rates.

The more substantive objections to the DLA Piper Application were filed by the U.S. Trustee and by Anjum. The U.S. Trustee objection [DE# 464] argues that the time billed by DLA Piper is excessive and did not provide a benefit to the estate commensurate with the amount billed. The U.S. Trustee's objection points to the time billed for numerous interoffice conferences, time billed in excess of $67,000 in the category of "Fee/Employment Applications," over $42,000 in the category of "Case

16

Administration" that is alleged to be beyond the scope of the retention and the lumping of numerous services within individual time entries. In general, the U.S. Trustee argues that the engagement was overstaffed in relation to the scope of the work and the potential recovery for the estate, including multiple timekeepers billing for the same services.

The Anjum Objection [DE# 455] also argues that DLA Piper invested far too many hours in the engagement in relation to the potential benefit to the estate. Anjum argues further that the realtors and title company could have or should have handled many of the matters DLA handled. Anjum claims that the time DLA Piper spent negotiating contracts that never closed provided no benefit to the estate, and therefore, merits no compensation. Anjum also argues that the negotiations should have been undertaken by the Trustee as part of his duties.

At the Court's request, the U.S. Trustee met with Craig Rasile from DLA Piper to discuss the objection and DLA Piper's response [DE# 457]. This discussion resulted in the filing of the UST's Recommended DLA Piper Fee [DE# 473] in which the U.S. Trustee recommends an award of $525,000 plus expenses of $2,293.

Anjum was not a participant in the UST/DLA Piper negotiations and the Court has undertaken an independent review to determine whether $525,000 (representing an 18.5% reduction) is an

appropriate fee award.  For the reasons that follow, the Court finds that a further reduction is appropriate.

The Court has reviewed DLA Piper's Omnibus Response and agrees with some of its arguments.  First, as special counsel, DLA Piper was engaged to undertake matters as requested by the Trustee.  This included pursuing a sale of the Weed Property, which was a long and arduous process.  Second, as special counsel, DLA Piper was not a guarantor of the results and it certainly did not agree to a contingency fee arrangement.  Third, the value of the estate's interest in the Weed Property should be viewed based on the value perceived by the Trustee, namely recovering one half of the proceeds of a potential sale at or above $1,300,000, not viewed based upon the ultimate value realized for the estate.

In further support of a fee that may still seem disproportional to the potential recovery to the estate, the sale process proved far more difficult than reasonably anticipated. The Weed Property was unique and hard to value.  There were also title issues arising from the Debtor's divorce from Anjum. Moreover, Anjum created the need for much more legal work by refusing to allow any closing proceeds to be held by the Trustee. In reviewing the services performed in furtherance of the sale effort, the Court must look at whether the services were necessary "at the time at which the service was rendered."  11 U.S.C. §

18

330(a)(3)(C).  At each step in the sale process, it was necessary for DLA Piper to continue its efforts.

Finally, the Court finds that it would be unfair and inappropriate to blame or punish DLA Piper for the failure of the several proposed buyers to close.  DLA Piper's Timeline Summary, attached as Exhibit 4 to the DLA Piper Application [DE# 451-5], provides a detailed description of the long sale process and the multitude of services performed by DLA Piper in connection with the several attempted sales.

The Court is overruling the U.S. Trustee's objection to the extent it argues that services performed to assist the Trustee in pursuing collection of the foreign judgments were beyond the scope of DLA Piper's retention.  The Trustee requested these services and the Court finds it fair and appropriate to expand the scope of the retention *nunc pro tunc* to allow reasonable compensation for this category of services, entitled "Sale of Judgments" in the DLA Piper Application.

Notwithstanding the foregoing findings, the Court reaches the inescapable conclusion that DLA Piper spent too much time on this engagement for the services within the scope of its retention and billed time for some activities that the Court finds are not compensable.  From the start, even with the Trustee's optimistic estimate of value, the net recovery to the estate would likely

19

have been no more than $650,000, less expenses.  The requested fees eclipse even that amount.

DLA Piper is a well-respected national law firm retained because the Trustee trusted its attorneys, particularly Craig Rasile, here in Miami, and skilled counsel in California to handle a complex closing.  But, it is incumbent upon any firm retained by a bankruptcy trustee to exercise staffing controls based upon the amounts at issue.  This was never a multimillion dollar asset that could support a number of attorneys working on the engagement and billing for their individual time, for time spent conferring with each other, and time spent drafting numerous memoranda to communicate with each other and with the other estate professionals.  *See Unsecured Creditors Comm. v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 961 (9th Cir. 1991) ("Absent unusual circumstances, an attorney must scale his or her fee at least to the reasonably expected recovery"); *see also In re Mednet*, 251 B.R. 103, 108 (9th Cir. BAP 2000) ("[T]he court must take into consideration whether the professional exercised reasonable billing judgment").

The Court has reviewed the time detail set forth in the 113 page exhibit to the DLA Application [DE# 451-4].  The first category of services is labeled "Case Administration" and contains entries totaling $42,995.  The Court finds that a significant

20

portion of this time is not compensable because it represents services beyond the scope of the retention.

As described earlier, the Trustee retained DLA Piper as special counsel tasked with negotiating and closing a sale of the Weed Property.  The Trustee was aware that DLA Piper is a national firm with high billing rates, but he wanted a firm that had counsel in Miami and counsel in northern California.  The Trustee did not retain DLA Piper to handle other issues in the case, including, for example, the objection to Anjum's claim.  DLA Piper was also not retained to assist Mr. Meyer in prosecuting the adversary filed by the Trustee to obtain authority to conduct a § 363(h) sale, nor to assist Mr. Meyer in the general administration of the estate.

Certainly, DLA Piper needed to be aware of the status of the § 363(h) adversary and aware of any other issues in the administration of the case that affected the sale of the Weed Property.  However, knowing the status of these matters did not justify Mr. Rasile or other attorneys billing anything more than minimal time for matters not directly related to the sale, including for example, billing time relating to the Anjum claim objection or the § 363(h) adversary.  Those matters were beyond the scope of its retention and were handled ably by Mr. Meyer. *See In re Mednet*, 251 B.R. 103, 100 (9th Cir. BAP 2000 (affirming bankruptcy court's disallowance of fees to special counsel for

21

performing services that general counsel could have or should have performed).    In sum, the Court is allowing $15,000 in fees for this category.

The major category of time comprising $462,962 is under the heading "Asset Disposition." The fees in this category are high, but the Trustee did retain DLA Piper to pursue a sale and the firm stayed on task throughout the process. Nevertheless, a reduction in this category is appropriate, including, for example, a substantial reduction in paralegal time, and a reduction for time reviewing broker agreements. As described earlier, Mr. Kessler took the lead in negotiating with the real estate brokers and both the Trustee and the Trustee's general counsel, Mr. Meyer, were involved in the process. DLA Piper's involvement in this process should have been very limited.

The Court is also reducing the award in this category because of excess time billed by lawyers other than Mr. Rasile and Mr. Hurley, and numerous memoranda and interoffice conferences between the attorneys. A further reduction is appropriate for time spent on matters not directly tied to the negotiation and closing of a sale contract for the Weed Property. This includes, for example, time billed relating to Anjum's objection to sale, time billed to research fee allocation issues, and time billed in connection with the eventual transfer of the estate's interest to Anjum in exchange

for a reduction in the distribution to Anjum on his claim.  Like much of the time the Court is disallowing in the Case Administration category, the legal work on these issues was part of Mr. Meyer's general retention, not within the limited scope of DLA Piper's retention.  In sum, the Court is allowing $385,000 in fees for this category.

A third category of time is labeled "Sale of Judgments" and represents $64,876.50 in fees.  As noted earlier, these services were beyond the scope of DLA Piper's retention, but the Trustee did ask DLA Piper to assist and the Court is awarding compensation for this category.

The Court finds it appropriate to reduce the compensation for this category down to $40,000.  As with the other categories, the time entries reflect too many interoffice conferences and memos between timekeepers in the firm and with general counsel.  As just one example, attorney Rachel Nanes billed time on March 14, 2013 to review a memo from Mr. Meyer and to prepare a memo to Mr. Rasile, and then Mr. Rasile billed time to review the Nanes memo.

The Court also found almost $5,000 in attorney or paralegal time billed in connection with a proposed supplemental retention application that was never filed.  This time is not compensable. Finally, the Court is not compensating DLA Piper for any significant time in connection with the Trustee's agreement with

Shad Capital.    There is no indication that the Trustee and
Trustee's general counsel, Mr. Meyer, needed assistance in
negotiating the Shad agreement and presenting it to the Court for
approval.

The final category of time in the DLA Piper Application is
under the heading "Fee/Employment Applications" and totals
$67,229.  The Court finds that a substantial portion of the time
spent under the "Fee/Employment Applications" category is not
compensable.  DLA Piper knew before it filed its fee application
that its fees were going to be contested.   Although fees spent
preparing a fee application are compensable, fees incurred
defending a fee application are not. *Baker Botts LLP v. ASCARCO
LLC*, 135 S. Ct. 2158 (2015).   The Court finds that much of the
time devoted to the fee application was, in fact, time spent in
anticipation of defending its fees.  DLA Piper's fee estimate was
disclosed at a hearing on October 10, 2017, a month before the
application was filed, and it was clear that its fees were going
to be challenged.

DLA Piper's total fee request of $644,062.50 includes $6,000
in additional fees "to conclude the fee application process" [DE#
451, p. 1, f.n. 1].  These estimated additional fees are disallowed
as fees incurred to defend the DLA Piper Application.   The Court
recognizes that this was not a routine fee application.

Nevertheless, the Court finds that $30,000 is reasonable compensation for the retention application and fee application.

In sum, DLA Piper is awarded total fees of $470,000 comprised of $15,000 for "Case Administration," $385,000 for "Asset Disposition," $30,000 for "Fee/Employment Applications" and $40,000 for "Sale of Judgments." The Court also allows $2,293.00 in costs for a total award of $472,293.00. Of this amount, the Court finds that the amount attributable to the Weed Property is $385,000, the fees awarded under the Asset Disposition category.

### Summary of the Fee Awards

| Applicant | Fee and Cost Award | Allocation to Weed Property |
|---|---|---|
| Marcum | $ 63,500.04 | $ 46,000.00 |
| KapilaMukamal | $ 44,201.20 | $ 39,238.00 |
| Meyer | $220,355.57 | $ 79,163.35 |
| DLA Piper | $472,293.00 | $385,000.00 |
| **TOTAL:** | $800,349.81 | $549,401.35 |

Based upon the foregoing findings and conclusions, it is -

**ORDERED** as follows:

1.    Marcum, LLP is awarded fees in the amount of $63,363.50 and expenses of $136.54 for a total award of $63,500.04. Of this amount, $46,000 is an expense of the estate in administering the Weed Property (a "Weed Property Expense").

2. KapilaMukamal LLP is awarded fees in the amount of $44,201.20 of which $39,238 is a Weed Property Expense.

3. Robert C. Meyer, P.A. ("Meyer") was previously awarded $100,000 in interim fees and $6,056.05 in interim costs. Meyer is awarded additional fees in the amount of $218,345.57 and additional expenses of $1,960 for a total additional award of $220,355.57. The Weed Property Expense portion of the total fees awarded to Meyer in the case is $79,163.35.

4. DLA Piper LLP is awarded fees in the amount of $470,000 and expenses of $2,293 for a total amount of $472,293, of which $385,000 is a Weed Property Expense.

5. The Trustee shall pay the fees and expenses awarded in this Order upon finality of this Order. This Order will be deemed final fourteen (14) days from entry on the docket unless a motion for rehearing is filed. If a motion for rehearing is filed, the Order will be deemed final fourteen (14) days from entry on the docket of an Order on the motion or motions for rehearing. The filing of a Notice of Appeal will not stay finality of this Order unless this Court or the district court enters a stay pending appeal.

6. The Court will enter a separate Order calculating the Gross Anjum Adjustment as defined in the October 13, 2017 Order [DE# 443], and setting a status conference to determine the Net

26

Additional Reduction to Anjum's distribution (as also defined in the October 13, 2017 Order), and to determine what remains to be done to close this case.

###

COPIES TO:

Robert C. Meyer, Esq.
David S. Abrams, Esq.
Barry E. Mukamal, Trustee
Craig Rasile, Esq.

**(Attorney Meyer is directed to serve a copy of this Order on all other interested parties and file a Certificate of Service)**